IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

K.M., individually and
on behalf of E.L., a minor,

        Plaintiffs,

v.

SANTA ROSA COUNTY SCHOOL BOARD,

        Defendant.

_____/

CASE NO.:
DIVISION:

## COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW, Plaintiffs, K.M., individually and on behalf of E.L., a minor, by and through the undersigned counsel, and hereby sues Defendant, SANTA ROSA COUNTY SCHOOL BOARD, and alleges as follows:

## PARTIES

1. Plaintiff, K.M., is an individual *sui juris* who resides in Santa Rosa County, Florida, and who is the natural parent of E.L.

2. Plaintiff, E.L., a disabled minor, who resides in Santa Rosa County, Florida, and is a student within the Santa Rosa School District.

3. Defendant, The School Board of Santa Rosa County, Florida ("district" or "Board") is a corporate body and governmental agency, duly empowered by the Constitution and statutes of the State of Florida to

1

administer, manage, and operate the Santa Rosa County Public Schools.

4. The district receives state and federal funding for the education of children with disabilities.

5. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

## JURISDICTION AND VENUE

6. Jurisdiction for this action vests pursuant to 29 U.S.C. § 794, for claims brought under Section 504 of the Rehabilitation Act of 1973 and 42 U.S.C. §§ 1983 and 1988 for violations of K.M. and R.L. and E.L.'s civil rights; and the District Court's pendent jurisdiction over the state claims alleged, which arise out of the same operative facts and circumstances.

7. Venue for this action lies pursuant to 28 U.S.C. § 1391(b) in that the Board resides in the judicial district and the cause of action accrued in the judicial district.

## GENERAL ALLEGATIONS

8. This action arises out of the discrimination and negligent supervision of E.L. by the employees, teachers, administration, aides and other

staff of the district and more specifically Holly-Navarre Middle School during the 2023-2024 school year.

9. Holly-Navarre Middle School is a traditional public school within the Santa Rosa County Public Schools.

10. E.L., now 15 years old, is a student with disabilities. E.L. has been diagnosed with an Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder, anxiety, a Language Impairment, and fine and gross motor skill impairment. E.L.'s deficits impact his executive function abilities including initiation, sustained attention, persistence, organization, time management, and emotional self-regulation. He also lacks the ability to understand social situations and interact appropriately with his peers. E.L.'s self-esteem and self-image and mental health have been impacted.

11. Although E.L. was identified as a student who could possibly benefit from special education supports and services in kindergarten (2015-2016 school year) he was not found eligible for exceptional student education (ESE) services until May 5, 2022, and he remains eligible to date.

12. Even when private evaluators through Independent Educational Evaluations (IEEs) recommended special education supports and

3

services, the district continued to deny eligibility for ESE services. It was not until an administrative complaint under the IDEA was filed that the district finally agreed to ESE eligibility.

13. E.L. now has an individualized education plan (IEP) that identifies his educational needs and the supports and services required to provide the student with a free appropriate public education (FAPE) under the Individuals with Disabilities Education Act (IDEA).

14. The district, however, delayed the creation of the IEP and this delay caused significant harm to E.L. and his mother.

15. The repeated delays and denials by the district were intentional and negligent acts reflecting deliberate indifference to the needs of this student resulting in the involuntary commitment and hospitalization of this child. The indifference by the district was a deliberate choice.

16. In kindergarten (2015-2016 school year), the teacher informed E.L.'s mother about problems with hyperactivity, impulsiveness and social skills issues that were affecting E.L's education, yet the district did nothing to address the student's needs.

17. The first action that a school district is obligated to do under the IDEA and Child Find is to evaluate a student who is suspected of having a disability that is impacting the student at school.

18. The district refused to evaluate this student.

19. In 2015 (kindergarten), E.L. received a private diagnosis of ADHD which was provided to the school, yet the school district did nothing.

20. The school next notified the family that E.L. was having difficulties with fine motor skills and behavior issues in class that were impacting his progress. The behaviors appeared to be stemming from self-esteem concerns related to the fine motor deficits, but yet the district did nothing.

21. The family, not waiting for the district to act, incurred the cost of private evaluations for occupational therapy (OT) and physical therapy (PT). The family incurred the expense of getting a private evaluation, unaware of the district's explicit obligation to evaluate the student.

22. E.L. began receiving private OT and PT services.

23. The family requested the school evaluate E.L. for OT and PT deficits so that he could be considered for services at school. The district denied the request stating that because E.L. was receiving private services he would not be eligible for services at school, a false statement. This was just the first of many false statements made to the family and documented in the school records.

24.    Each year, E.L.'s difficulties at school increased. His mother repeatedly asked, in writing, for an evaluation for special education services, but was ignored.

25.    E.L.'s grades continued to decline each year and in 3rd grade (2018-2019 school year) he was in danger of failing.

26.    In 2018 (3rd grade), the family was invited to a meeting which was reported to be an Exceptional Student Education (ESE) eligibility meeting under the IDEA, but when the mother arrived, she was told that it was a 504 plan meeting, not an ESE meeting.

27.    Unlike ESE eligibility under the IDEA which provides the child with an IEP, specialized education services and related services, a 504 plan under Section 504 of the Rehabilitation Act only provides a student with accommodations to ensure the student can access his education. Section 504 does not provide the parents or student with any procedural safeguards as required by the IDEA.

28.    In December 2018 (3rd grade), a 504 plan was drafted that recognized the student had disabilities that were impeding his ability to learn. The 504 plan described a single challenge related to writing assignments timely and the teacher recommended two accommodations including the use of a timer for writing assignments

and a visual checklist to help with organization both of which were not included on the 504 plan. The 504 plan instead provided for (1) extended time for assessments and assignments and (2) positive reinforcement for using appropriate behaviors. The plan was so wholly inadequate and failed to address all the student's deficit areas, that it alone provides this Court with significant proof of the district's deliberate indifference to this child's needs.

29.    At this meeting, the mother again asked for PT and OT assistance at school. The mother expressed concerns that E.L.'s self-esteem was so low he feared going to school. The district again did nothing. No evaluations were initiated.

30.    E.L. continued to struggle at school, academically and socially and emotionally. Midway through the year, the school offered only one proposed intervention: transferring E.L., to a new classroom teacher. The parents paid for another private psychoeducational evaluation and the student was diagnosed with an additional disability, an Autism Spectrum Diagnosis (ASD).

31. In 4th grade (2019-2020), the family shared the private Autism Spectrum Diagnosis (ASD) diagnosis with the school.

32.    The school district again did nothing.

33.    The lack of supports and services were having a dramatic impact on E.L. and he began experiencing mental health challenges on top of his academic and behavioral issues.

34.    At a 504 meeting his mother again requested an evaluation for ESE services. She was denied the evaluation because he was not yet failing academically, another falsehood.

35.    His mother again requested OT and PT services, but was denied because he did not have an Individual Education Plan (IEP), yet another falsehood.

36.    In what can only be described as predictable, E.L.'s behaviors increased to aggression towards himself and other students, along with property destruction.

37.    E.L.'s mental health deteriorated to the point that he required hospitalizations.

38.    E.L.'s mother begged the district for help and for an evaluation, but the school district again denied her requests.

39.    E.L. spent hours after school receiving private services paid for by his mother, at great expense to the family.

40.    Every year in elementary school, E.L's mother asked for an ESE evaluation, but it was denied.

41. The 504 Plan that was in place in elementary school was occasionally adjusted by the school, but no services were ever added and no evaluations were ever initiated by the district.

42. E.L. entered Holly-Navarre Middle School for middle school in 6th grade for the 2021-2022 school year.

43. Inexplicably, the middle school did not recognize the student's 504 plan because it was "in draft" so could not be utilized. As a result, E.L. did not even receive the few accommodations he had received in elementary school. E.L. was also denied district transportation to his private therapies, even though an ESE bus transported other children to the same location daily, because the district stated such accommodations required an IEP and were not permitted under a 504 plan.

44. E.L. received no accommodations in 6th grade.

45. At the beginning of 6th grade, the parents again asked for evaluations. The middle school assured the family that evaluations were being conducted and that an ESE eligibility meeting would be scheduled without delay. The family was told that a psycho-educational evaluation had been conducted. None of these statements turned out to be true.

46.    In 6th grade rather than evaluating the student, the district began to discipline the student for behaviors that were a clear manifestation of the student's disabilities and what appeared to be in retaliation for the parents' advocacy.

47.    The student was disciplined for giving one student another student's telephone number. The stated reason for the discipline was that E.L. had violated another student's confidentiality/privacy by giving out the phone number. How this act of sharing another student's phone number was a violation of the student of code of conduct is still unclear.

48.    E.L. was then disciplinarily removed from his class and reassigned for blowing a kiss to a friend of his across the room. The parents objected to the removal because it would have a devasting impact on E.L. emotionally and socially and that such a change and for this reason would be compounded by the student's autism. In response, the principal told the family that the school did not consider E.L. a student with a disability since he did not have an active 504 or IEP in place.

49.    The mother was further told she could accept the administrative change or E.L.'s would be changed with sexual harassment of another

student and he would be suspended out of school and recommended for expulsion for sexual harassment.

50.     This (February 2022) was when the family learned for the first time that evaluations had not in fact begun.

51. For the first time, the mother was given a consent form to sign. It had been almost seven years since the family's first request for an evaluation.

52.     The middle school told the family that they have 60 school days to complete any evaluations from the date the consent was signed.

53.     A psychoeducational evaluation and language assessment were finally conducted. It appears as if they began in February of 2022, but they were not reviewed with the family until May of 2022.

54.     An eligibility meeting was not held until May 5, 2022, and an IEP was finally written.

55.     The IEP, while better than nothing, failed to address all the child's needs and was not designed to provide a free appropriate public education (FAPE).

56.     Throughout E.L.'s school career, the family shared with the school updates and reports from all of E.L.'s private providers including reports from his psychiatrist, Board Certified Behavior

Analyst (BCBA), Occupational Therapist (OT) and Physical Therapist (PT) providers. The school refused to include any information from any of the private providers or their reports resulting in an incomplete picture of the student. The school reports were limited and thus the IEP proposed was inadequate to address the whole child or all his needs and was thus poorly designed and failed to a free appropriate public education (FAPE).

57.    The parents begged the district to review the private information as it was essential to understanding E.L.'s mental health challenges and its impact on him during school hours.

58.    Despite repeated requests by the parent, no OT or PT evaluations were conducted as part of the initial evaluation and thus no services could be provided without the district first doing its own evaluations. The parents signed another consent for evaluations in May of 2022.

59.    However rather than conduct its own evaluations the district offered the family Individual Education Evaluation (IEE) for OT and PT. The IEE allows the parents to select an evaluator and the district pays for the evaluation. The parents reluctantly agreed.

60.    E.L. began the 7th grade school year (2022-2023) with the new IEP, but in August 2022, the district sought to schedule a 504 meeting

12

with the family. Normally, once a student has an IEP, they no longer maintain the 504 plan. The IEP supersedes any 504 plans that might have existed. That did not appear to occur in this case. The district also attempted to amend E.L.s IEP to reduce language services and remove them all together and to remove E.L from his general education classroom and place him in an ESE setting, citing that this was the only available method to fulfill the ESE service minutes outlined in his plan. Confused and frustrated by these developments, the parents hired an educational advocate attorney to ensure their son's rights and services were properly upheld.

61. A telephone meeting was held in November 2022, wherein the district made several promises which were not upheld.

62. A formal IEP meeting was not held until the end of the school year in May 2023. The district was intractable in its positions. It was not moved by new information, new data or information by private providers yet refused to share any of its own data with the family.

63. A private neuropsychological evaluation was completed in May 2023 by Karen Patterson Hagerott, Ph.D., P.A. A private Occupational Therapy (IEE) was also completed by Shane Earley, MS, OTR/L, ATC. Although the OT evaluation was sent directly to Ms. Anderson, head of

ESE for the district, the district claimed it was never received.  The OT evaluation was resent on August 9, 2023.  Both reports were shared with the school district. A private PT IEE was completed also.

64.    Another IEP meeting was held with the district on August 22, 2023, just after the start of the 2023-2024 school year. E.L. was now in the 8th grade. This meeting had a facilitator from the state. Ms. Anderson made disparaging and untrue statements about the mother to the facilitator. The meeting ended without a completed document, i.e. an updated IEP for the student.

65.    The district instead sent a working draft of the IEP to the family after the meeting, but the draft excluded most, if not all, of the information discussed during the meeting and the final document had changes made to it after the meeting ended that the parents did not agree with and did not consent to. The parents objected. Their objections were ignored or denied. The redrafted IEP was implemented.

66.    E.L.s initial IEP provided 5 minutes per month of Language Consultation services. This is not a direct service to the student but rather when the grownups speak to each other about the student for

five minutes per month. Despite it being on the student's IEP there is no data that this consultation ever occurred.

67.    In August 2023, without input from the family and after the meeting was over, the district increased the consultation minutes from 5 minutes to 15 minutes. This small increase failed to address the family's repeated requests for direct language support for E.L. and other related services and supports, which were all denied during the facilitated meeting.

68.    During the August 22, 2023, IEP meeting, the parents asked how ESE services would be provided. The district's response was to accept an ESE class or receive no ESE services on the IEP. This is a false choice that should never have been presented to the parents and was a threat to remove services if the family did not agree to what the district was offering. This also ignored the recommendations in the private IEE evaluations.

69.    Another falsehood that came to light, was that the middle school fabricated ESE services. E.L.s school record indicated E.L. received services in 7th grade during a Unique Skills class taught by the ESE Liaison, Ms. Baston. Ms. Baston authored parts of E.L.'s 8th grade IEP, and the rest of the IEP team was under the mistaken impression she

had previous knowledge of the student as his ESE teacher the prior year. In reality, E.L. did not participate in Unique Skills class in 7th grade with Ms. Baston, but rather attended a Coding Class, which he ultimately failed. E.L. had little to no engagement with Ms. Baston. This lack of familiarity was made evident when she attended a disciplinary meeting of E.L.'s midway through his 7th grade school year: neither E.L. nor his mother recognized her, and both were confused by her comments about E.L. as if she had worked closely with him or knew the family. E.L.'s parents clarified to the IEP team who had drafted the amendment prior to 8th grade that Ms. Baston had not worked with E.L. during 7th grade, yet no corrections or adjustments were made to the IEP documentation.  Despite this, the school assigned Ms. Baston as E.L.'s history teacher for 8th grade – under the premise that she could concurrently deliver ESE services. This decision appeared to rely on inaccurate assumptions about her prior involvement and raised the family's concerns about the integrity of the service assignment process.

70.     As the family continued to advocate for E.L. and push to get appropriate services and supports on his IEP and imbedded throughout his school day, E.L. continued to struggle through 8th grade. The IEP being in place was not designed to provide this student

16

with a FAPE and was inadequate to address the address all of the child's needs. The IEP, as inadequate as it was, was not even being implemented. Compounding this, the ESE liaison not only failed to implement the services, she falsified progress reports and engaged in retaliatory practices when E.L.'s mother advocated for his accommodations to be provided.  For example, in response to E.L.'s repeated requests for help implementing the electronic planner described in his IEP, E.L. was forced to carry a conspicuously bright yellow "Daily Planner" to be signed by each of his teachers – a requirement dictated by Ms. Baston that directly contradicted accommodations in his IEP.  E.L. faced chastisement and academic consequences if the planner was not signed, adding punitive pressure instead of support.   Rather than offering stability and support, his relationship with Ms. Baston became a significant source of emotional distress, further undermining his ability to thrive academically and emotionally.

71. This fact became clear on March 8, 2024, when E.L. was able to leave the school campus without any adult noticing. No administrator, teacher, school resource office, staff member or any other adult on the

middle school campus realized that E.L. had left class and climbed over a school fence and left the school campus.

72.     E.L. left one class with permission of his teacher but never returned to that class. He did not show up for his next class or the next class. It was not until a fellow student reported E.L. missing and stated that he was worried that E.L. was going to hurt himself that someone from the middle school noticed that E.L. was not in class and had not been in class for several hours.

73.     E.L. had told his friend earlier in the day some things that lead the student to believe that E.L. might be in danger. This conversation occurred after E.L.'s "history" class with Ms. Baston.

74.     E.L. was not reported missing right away to law enforcement nor were the parents notified right away that E.L. had left the school campus. Instead, the middle school administration began to review video footage and interview other students.

75.     When the parents and the police were eventually called, no one could locate E.L.

76.     E.L.'s planner notebook, required by Ms. Baston, was later discovered near a body of water. E.Ls. backpack, which had been turned into the front office along with a note when he failed to return

to class, sat unnoticed.   No staff or administrators reviewed the contents of either until E.L.'s mother, denied access to the surveillance footage, asked whether he had his backpack on video.  At that point, someone recalled a backpack had been sitting there for hours.  E.L.'s mother checked the bag, revealing a hand-drawn map of the school and surrounding area.  In the planner notebook, E.L. had written a message in large letters across two pages that clearly indicated his distress.  By then, E.L. had been missing for several hours.

77. E.L. was eventually found over five miles away from the school campus. He had walked to his friend's bus stop and was waiting for him to get home from school. The friend's mother alerted her son, who contacted E.L.'s mother who notified law enforcement and the school. Upon information and belief, the police were just about to issue an amber alert.

78.     Law Enforcement followed the mother to the friend's house and reported to the mother that E.L. needed to be Baker Act (involuntarily hospitalized) because the school administration had told law enforcement that they (the school administrators) had heard from other students that E.L. had talked about killing himself. Either the family could take him, or the police would take him.  Upon information

and belief this school administrators instructed law enforcement to Baker Act (involuntarily hospitalize) E.L. and the family was told that E.L. would not be allowed to return to school until he was cleared by a psychologist.

79.     The family rushed to the friend's house and were able to locate E.L. near the home. E.L. did not associate with this friend outside of school but knew where he lived because they rode the same school bus. E.L. chose to go to his house because the child was kind to him when he was telling him about his distress that morning.

80.     E.L.'s distress was, in part, due to an interaction that he had with Ms. Baston in class (the class period before he left school) that was completely inappropriate and triggering for E.L. When Ms. Baston was asked about E.L. that day, she intentionally failed to say anything despite being asked directly by mom and school administrators about her interactions with E.L. that day.

81.     Law enforcement followed the mother to the friend's house and advised the family that they would be taking E.L. into custody to Baker Act him.

82.     The family asked if the student could instead meet with his treating doctors and law enforcement said, while you can meet with

20

them briefly, we still have to take the student in based on the school district's orders. The family was allowed to transport E.L. themselves but was not given the choice of a less restrictive option to involuntary hospitalization.

83.    E.L. was hospitalized.

84.    Upon release, E.L. was afraid to return to school and the family shared deep concern about sending him back to school without proper supports and services in place.

85.    One of the main concerns with returning to school was returning to Ms. Baston's class. The school and district made it extremely difficult to change E.L.'s schedule. The school/district were also reluctant to document the known problems between Ms. Baston and E.L.

86.    The family increased private supports for E.L. hoping to stabilize him while waiting for the school to take meaningful action.

87.    As stated, E.L.s  distress was triggered, in part, by negative and inappropriate comments about E.L.s future by Ms. Baston, the class period before he left campus. Despite being directly questioned by E.L.'s mother and school administrators while E.L. was missing, Ms. Baston failed to disclose any details about their interaction and implied

21

that E.L. had seemed fine in her class. This silence was especially troubling given the family's repeated warnings to the principal about her problematic behavior and E.L.'s clear mistrust of her.

88.     Despite this prior knowledge, the school assigned Ms. Baston to monitor his found planner in case he returned – an action that likely would have discouraged him from doing so had he seen her and more evidence of the schools deliberate indifference towards this child.

89.     The school finally agreed to implement appropriate supports in place so that E.L. could return to school safely and finish out his 8th grade year. E.L. missed a month of school. The family's top concern about E.L.s return centered around minimizing interaction with Ms. Baston, yet they faced continued resistance from the school and district in changing his schedule. Efforts to document concerns formally were met with evasion, as administrators repeatedly refused to put in writing any acknowledgement of the ongoing problems involving her.

90.     It was not until July 2024 that a more comprehensive IEP plan was finally established, following extensive efforts by the family. Despite the district's agreement to start fresh with a new high school team, the initial draft IEP they presented was once again based largely on input from Ms. Baston and the middle school principal – whose

involvement had previously caused E.L. distress and whose credibility had been repeatedly questioned by the family. This undermined the spirit of collaboration and trust the new IEP process was meant to restore.

91. E.L. entered high school (2024-2025 school year) with this new IEP and for the first time had a successful school experience.

92. The district however continues to threaten to reduce services.

93. The district was deliberately indifferent to the needs of this student for years.

94. Had the district not so completely failed this student, he would not have been Baker Acted nor would his parents have had to incur the thousands and thousands of dollars of private evaluations and therapies.

95. These events have had a profound and debilitating impact on child and his mother. E.L.'s mother suffered a transient ischemic attack (TIA) in December 2024. His mother has developed stress-exacerbated autonomic dysfunction. Her neurologist has confirmed that this is likely triggered by chronic emotional stress. She now struggles with processing information and speaking clearly, especially when she is physically or emotionally overexerted. She also gets fatigued quickly.

In addition to communication difficulties, she is experiencing significant motor impairment, severe hypoglycemia, orthostatic hypotension, syncope, and episodes of dysregulation that leave her unable to perform basic daily tasks. These symptoms are unpredictable and destabilizing and she has not been able to return to full-time work, and it remains uncertain when—or if—she will.

96.     The emotional toll of advocating for E.L.'s safety and education in the face of discrimination has had direct medical consequences on E.L.'s mother who fears they may be permanent. Her cognitive capacity has been significantly impacted. Despite holding dual master's degrees and having spent my professional career reviewing complex, technical documents, she now struggles to read for more than 20 minutes without losing comprehension. Beyond these cognitive impairments, the distress has affected her ability to socialize, manage household responsibilities, and maintain any semblance of normalcy. She now avoids phone calls and meetings out of fear she will not be able to articulate herself clearly, which has compromised her ability to advocate effectively.

97.     Ironically, E.L.'s mother who spent years advocating for E.L. to receive OT and PT and language therapy is now needing those same

services herself. Instead of advocating for E.L., she is now needing to advocate for herself. Her needs reflect the deep and ongoing impact that this situation has had on both E.L. and K.M.'s physical and emotional wellbeing.

98.     K.M. engaged Langer Law, P.A. to represent them and are obligated to pay a reasonable fee for their services.

## COUNT I
## SECTION 504 OF THE REHABILITATION ACT OF 1973
## 29U.S.C. § 794(a)

99.     K.M. and E.L. repeat and reallege the allegations in paragraphs 1 through 98 of the Complaint as if fully set forth herein.

100.    Plaintiffs further allege that E.L. has a disability that substantially limits one or more major life activities and is a person with a disability under Section 504 of the Rehabilitation Act, as amended. See 29 U.S.C. §706(8).

101.    E.L. is otherwise qualified under section 504 of the Rehabilitation Act because he met the essential eligibility requirements of the district at all times material hereto.

102.    Defendant is a recipient of federal financial assistance.

103. The district's policies, practices and procedures violated the Plaintiffs' rights under Section 504 of the Rehabilitation Act by discriminating against the Plaintiff because of his disability.

104. Section 104.33 requires that Defendants to provide FAPE to "each qualified handicapped person who is in the recipient's jurisdiction." For purposes of Section 504, an "appropriate education" is the:

provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36.

105. An "appropriate education" can also be provided by implementing an IEP that is compliant with IDEA. 34 C.F.R. §104.33(b)(2).

106. Because the District did not timely identify and evaluate E.L. they violated section 504.

107. In addition, because the district did not have an appropriate IEP (or behavior plan) in place, the district acted with deliberate indifference to the needs of this student in violation of section 504.

108. Repeatedly ignoring and dismissing the parent's requests and concerns, disciplining the student for identified and known problem

behaviors, ignoring the student's needs resulting in the student's involuntarily hospitalization (Baker Act) lead to trauma, a dislike for learning, and a decrease in self-esteem and self-image.

109.    The Defendant has discriminated against E.L. in violation of Section 504 of the Rehabilitation Act on the basis of his disabilities by failing to evaluate and provide the student with the necessary supports and services resulting in the unnecessary institutionalizing of E.L., and placing him or at risk of unnecessary institutionalization.

110.    The actions of the district were done with deliberate indifference to the rights of E.L., and his parents, and as such, the Plaintiffs are entitled to damages for their injuries as a result of these discriminatory policies.

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief against the District, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendants' practices, policies and procedures have subjected Plaintiff to discrimination in violation of Section 504 of the Rehabilitation Act permanently enjoining Defendant from any practice, policy and/or procedure which will deny Plaintiffs equal access to and benefit from Defendant's services, award compensatory damages, reasonable costs

and attorneys' fees and any other relief this court deems necessary and appropriate.

## COUNT II
## CIVIL RIGHTS – PROCEDURAL DUE PROCESS

111. K.M. and E.L. repeat and reallege the allegations in paragraphs 1 through 98 of the   Complaint as if fully set forth herein.

112.     Pursuant to IDEA and the Florida law implementing IDEA, the district had a duty and failed to provide J.B.H. and L.H. with procedural safeguards, including:

   a) Failure to timely evaluate E.L.;

   b) failure to develop an IEP for E.L.

   c) improper use of Baker Act;

   d) failure to allow the parent's meaningful participation;

113.     These violations were not de minimums and impacted the parents' ability to participate as equal members in the process, delayed and denied the student access to the supports needed to access his education.

114.     The District's failures deprived K.M. and E.L. of the right to procedural due process under the United States and Florida Constitutions.

28

115.   By violating K.M. and E.L.'s constitutional rights, the district deprived K.M. and E.L. of their civil rights pursuant to 42 U.S.C. § 1983.

116.   As a result of the deprivation of their civil rights, K.M. and E.L. have been damaged.

**WHEREFORE**, K.M., on behalf of E.L., demand judgment against the Defendant for damages, together with their attorney's fees and costs pursuant to 42 U.S.C. §1988, and such further relief as the court deems just and equitable.

## COUNT III
## NEGLIENT SUPERVISION

117.   K.M. and E.L. repeat and reallege the allegations in paragraphs 1 through 98 of the   Complaint as if fully set forth herein.

118.   The defendant had a legal duty to properly supervise E.L. while he was on a school campus.

119.   At all times material, the district was in *loco parentis* and was held to a standard of reasonable protection for the Plaintiff – a disabled child/student.

120.   At all times material, the Defendant owed a duty to E.L. to use reasonable care to ensure E.L.'s safety, care, health, and well-being.

29

121.    Defendant breached such duty by failing to supervise E.L. in a manner that protected him from being able to skip multiple classes, climb a fence and leave the campus unnoticed by any and all adults.

122.    The middle school teachers, administrators and other staff, agents, and employees were negligent in their duty to supervise E.L.

123.    As a direct and proximate cause of the negligent supervision, the Plaintiff suffered injury, both physical and emotional. He was also involuntarily hospitalized as a result of the defendant's breach of its duty.

124.    These injuries were entirely preventable.

125.    The Defendant was negligent in the manner that E.L. was supervised while on the middle school campus.

**WHEREFORE**, the Plaintiffs sue Defendant for damages in excess of $1,000.000.00 including pre-and post judgment interest to the extent allowed by law, plus costs and interest, and demands a jury trial of all triable issues.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

126.    K.M. and E.L. repeat and reallege the allegations in paragraphs 1 through 98 of the   Complaint as if fully set forth herein.

30

127.    Plaintiffs further allege that the Defendant had knowledge of Plaintiff, E.L.'s disabilities and his needs, however and notwithstanding that knowledge, intentionally deprived Plaintiff of his rights, and also Baker Acted him after he was able to leave the school campus because of negligent supervision at the middle school campus.

128.    Based upon the Defendants' outrageous acts of discrimination showing both deliberate indifference and reckless acts, the Defendant intentionally inflicted emotional distress unto the Plaintiffs.

129.    As a result of the Defendant's actions, Plaintiffs suffered damages.

**WHEREFORE**, Plaintiffs demand a judgment against the Defendant for compensatory damages, extreme emotional distress, damages of physical injury, physical discomfort and inconvenience, mental suffering, humiliation, loss of enjoyment of life, loss of freedom of movement, punitive damages, interest, attorneys' fee and such further relief as this court deem just and equitable.

## **JURY DEMAND**

**A TRIAL BY JURY IS DEMANDED FOR ALL ISSUES TRIABLE AS OF RIGHT BY A JURY.**

31

Dated this 11th day of September, 2025.

> BY:  LANGER LAW, P.A.
>       s/ Stephanie Langer, Esq.
>       Stephanie Langer, Esq.
>       Fla Bar no: 149720
>       15715 S. Dixie Hwy., Suite 205
>       Miami, Florida 33157
>       Tel: 305.570.0940
>       Fax: 305.204.9602
>       Email Slanger@langerlawpa.com
>       admin@langerlawpa.com
>       *Attorneys for Plaintiffs*